141722, Medtronic, Inc. v. NuVasive, Inc., Mr. Oliver. Go ahead. Good morning, and may it please the Court. This is an appeal of an inter-party re-examination from the Patent Office. The patent issued, the 058 patent, relates to minimally invasive spine surgery using well-known techniques and instruments such as dilators, stimulating electrodes, and retractor blades. All of the original claims of the 058 patent were found unpatentable and subsequently canceled. That was also the fate of many of the other claims added during re-examination. However, one set remains, anchored by Independent Claim 10. The two issues on appeal are whether or not that set of claims was improperly broadened, and second, whether or not the Coros reference, which describes the use of fixation screws on a retractor blade, meets the limitation of a locking member on a retractor blade, both of which fix the retractor blades to the bone of the spine. I think you've got an interesting argument that 32 in Coros satisfies the limitations, but the problem is you don't have any expert who said that. You're asking us to review Coros and interpret it and interpret whether it satisfies the claim limitations. That's pretty difficult for us to do. What's your answer to that? Well, I don't know that an expert is needed based on the reference to Coros as a whole. What we're asking the court to do in this case is look at what is required, not just a particular embodiment of Coros, but what the reference as a whole teaches. If you look at the background and the objectives of the invention discussed in Coros, it describes the use of screws with retractor blades in general. Well, I don't think that's it. The screws is not the problem, because the screws do appear with respect to 32, what are called the distractor blades. The problem is with the locking member releasably received, et cetera, which the board said you hadn't established that those other aspects were satisfied with respect to 32, as I understand it. That's correct, but we did establish that they were shown with respect to blade 30, which is not disputed. What we've also argued, though, is that it doesn't matter which blades the screws are put on. I'm sorry. Is your argument that the screws should be moved to 32 or that the locking mechanism should be moved to 32? The argument below is that it doesn't really matter what blades are used. The primary argument, however, in the claim charts and originally relied on blade 30 and the fact that Coros discloses that screws may be used with retractor blades. The way these systems work is that these blades that have the screws are the ones that align with the spine. So it's a matter of just orientation. If you were to turn this thing 90 degrees, you would have to move which screws are on which blades. If you rotate it again, it would just have to be altered so that the blades aligned with the spine are the ones that have the screws. As far as the issue of whether or not blades 32 teach the other features, we think that's clear, but that obviously is not what was discussed in the record below. It was discussed in the record below with respect to retractor 30. However, we do agree that these retractors are basically almost mirror images of each other. They recite a lot of the same features. It just happened that for purposes of the claim chart, we pointed to the features relative to the retractors that we used for 30. With respect to the broadening issue, the original claim 4 recited the step of sensing the response of a nerve depolarized by stimulation. However, the new claims that are at issue here, starting with independent claim 10, change that sensing step. Instead of sensing the response of a nerve, it senses an electromyographic or EMG response of a muscle. It is undisputed in the record that EMG responses, which is basically just electrical activity, can come from a number of underlying causes. Those may be tremors, voluntary patient movement, as well as physical manipulation of the patient. The issue here on the broadening question is whether or not claim 10 could potentially cover anything that claim 4 does not cover. We think this is the very definition of broadening because sensing EMG responses alone would sense electrical activity not caused by a nerve. Thus, you are no longer sensing just a nerve response. Now, to overcome this problem, New Basic has asked this court and the board below to read into the claim terms such as only and excluded. Specifically, to read the sensing step of sensing only EMG responses having a particular underlying cause. Well, there's plenty in the spec, isn't there, that would support that conclusion? I mean, look at column 11, lines 26 through 33. T-stimulation signals may cause nerves adjacent to or in the general proximity of a surgical access system to depolarize. This causes muscle groups to innervate and generate EMG responses. I mean, it's repeated throughout the spec that the point is that the detection of the muscles is for purposes of detection of sensing the response of the nerve depolarized. If you're talking about the intended specification, I think you're exactly right. The question is whether or not we can read into the claim the intended specification. What's described in the specification as well as the prior art references of records such as Kelleher are basically three distinct steps. Sensing electrical activity in a muscle. That electrical activity may come from any number of causes, one of which would be nerve depolarization. Since the idea is to look for a nerve, what the next step is to determine or analyze causation to make a determination or a filtering as to whether or not that particular EMG response likely came from electrical activity of the muscle. And to do that, there's multiple ways disclosed in the specification, the documents incorporated by reference, and the prior art references in the record. That can be looking at the magnitude of the response, the size of the voltage. It can be done by looking at the shape of the voltage. But there has to be that next step of looking at what the causation is. Once you have filtered that down to what was likely a nerve response, that is then used to determine proximity. So we have in the specification, as your honor points out, three ideas here. Sensing an EMG response, determining causation, then determining proximity. And what Claim 4 recited is sensing a nerve response, which could broadly be interpreted to cover all three of those. However, if you look at Claim 10, it actually skips that middle step. It senses all EMG activity because the record establishes that EMG sensors must, by their very nature, sense all EMG activity. And then it uses that in the proximity determination. We don't disagree that the intent of the specification includes one. We also don't disagree that to get a more accurate determination of proximity, it would be better to filter down all of the EMG responses. There's always going to be some issue of how accurate your determination of proximity is. The more filters you use, the more analysis of causation you provide, the better that determination will be. What we have here is a complete lack of the causation requirement in Claim 4. But we can't ignore the fact that the specification repeatedly, and I cited view to one, but there's about six or seven other places where it makes it clear what it is that the relationship of the muscles must have to the nerve. But it also makes clear how to actually filter those out. And one of the examples they give at the bottom of Column 11 is looking at the magnitude of the EMG response. How do we know that that EMG response was actually a nerve activity? Well, one way is we look at the voltage. And we're going to set a minimum voltage of, I think it is 100 microvolts in there. That is the next step that's needed to actually perform what is required by Claim 4, sensing a nerve response. If you simply sense, it would be like a step of detecting whether Judge O'Malley has turned on a light switch. And you do that by putting a light sensor in a room and then using some other next step as to determine who actually turned the light switch on. But if you change that to detecting whether Judge O'Malley turned on a light switch by just simply putting a light sensor in a room, you've only done part of the analysis needed to actually sense who turned on the light. Can I ask you this? Why doesn't the word response, when it is not expressly followed by a word like to, necessarily nevertheless imply something about what it's a response to? And then the spec and the whole purpose here immediately tells you what that thing is, namely the depolarized nerve. Well, I think there has been no disagreement in the briefing back and forth that EMG responses are electrical responses. To what? You could poke a person's leg, you'll get an electrical response. You could have a voluntary muscle movement, you'll get an electrical response. So when this says sensing an EMG response of a muscle coupled to a nerve, you just don't think that there is implicit, given the purpose and everything, that it is a response to the nerve depolarized by stimulation. That is the argument that New Basic uses, that you should read coupled to to be caused by. But as the dissent pointed out below using the correct analysis, the claims simply don't recite only sensing EMG responses having a particular annoying cause or sensing EMG responses caused by this. Well, isn't the point that we're supposed to construe Claim 4, giving it its broadest reasonable construction in order to then measure that against Claim 10? That's only part of the analysis. The analysis, there were two different analyses used below. The majority did exactly that. They looked at Claim 4 and said, well, if we're talking broadly about sensing a nerve, part of sensing a nerve as described in the specification can use EMG activity. We don't dispute that. But the proper test for broadening is not, could Claim 4 cover potentially EMG sensing? The question is using the broadest reasonable interpretation of the new claim, Claim 10. Could that potentially cover something else? And what the dissent did was the proper analysis, which is, if I broadly construe Claim 10. Right, so let me just try to say the same thing again. It seems to me you are completely missing that when there's a word response, there is a suggestion of it being a response to something. And the suggestion is that it's a response to the thing that follows in the language. And that suggestion, I guess I want to know why is it not compelling when that's the obvious thing that this whole device is supposed, that this element of the device is intended to do. Respond to the stimulation that depolarizes the nerve. I think the understanding from both sides has been that EMG responses is just a term of art that talks about muscle or electrical activity. There hasn't been a dispute on the other side. In fact, I think their brief actually acknowledges that it is undisputed  Of course they can. But this is a clause that says response of a muscle coupled to a nerve depolarized by said stimulation. Why does not that tend to suggest that it's a response to the thing that follows, not compellingly, but then when you look at the spec and the whole purpose of this, it becomes compelling. I think the answer to that is this language was specifically changed to this, instead of saying caused by, saying coupled to, which as the dissent acknowledges is just a physical connection. This was an amendment made in the reexamination. If the other side wanted it to be caused by, they could have recited caused by. And as the dissent noted, once the initial decision which found broadening was issued, they could have gone back and actually corrected the language. This was not reliable. I guess my question is that they have to actually correct the language. What they've said pretty much amounts to a disclaimer of the broader coverage, right? Can we pay attention to that? If it made sense. What they've argued is we should read that step as sensing only EMG activity that is caused by nerve depolarization. Now, that could be a proper construction if it had, well, first of all, under the broadest reasonable interpretation, the question is why would you read only this claim? No, but can we take account of a disclaimer? Suppose they'd said explicitly your reading of the claim is incorrect. This is limited to muscle movement caused by electrical stimulation of the nerve, and that's all that this claim covers. That would be a disclaimer. Why wouldn't that be binding on them? It could potentially be binding on them. The issue is if you do interpret the claim that way, sensing only EMG responses having a specific underlying causation, there would have to be support or enablement for that, and that requires some sort of sensor that can sense not only a voltage, but the underlying cause of the voltage, and as is described as the documents incorporated by reference, EMG electrodes conduct any electrical activity. These are just sensors that sense voltages, so the question is if you're going to use that construction of sensing only voltages having a cause, there has to be enablement and support, and there's nothing here that describes a sensor or a sensing staff that can determine a 60 microvolt voltage that came from one cause versus another, so how would we actually construe that outside of this if there's no sensor that can really do that? If the court is saying that we're going to construe this to be sensors that sense EMG activity and can tell by the voltage alone what the cause is, that would be very narrowing and that could be an issue here, but the question is is there any support for that in the record, and I don't believe there is, and if there isn't, how do we come to that as being the correct claim construction? Okay. All right. Thank you, Mr. Holler. We'll give you two minutes for rebuttal. Thank you, Your Honor. Mr. Rosado. Thank you, Your Honor. May it please the court. I'd like to address the claim broadening issue first that was discussed, and there can really be no doubt here that the board got the claim construction analysis as well as the broadening analysis right. Their conclusion as set forth in the decision on rehearing was, and I quote, the language of Claim 10 links the sensed EMG response of the muscle to the depolarization activity of the nerve and thus excludes other responses that are not the result of electrical stimulation of the nerve. So that is a correct interpretation. The process in getting to that conclusion was correct, and it flows naturally from a plain reading of the claim, Claim 10, and I'd like to turn attention to that claim to support that argument. But looking at the sensing step, as Your Honor noted earlier, there is a response, an EMG response, and that sensing step links together the response, the depolarization of the coupled nerve, and the electrical stimulation. It's interesting that Your Honor noted the term response because the dictionary definition in the biological context is an action or movement due to the application of stimulus. So in the context of that limitation, it's virtually inconceivable that an EMG response has nothing to do with the depolarization of the nerve or the recite electrical stimulation. If there is any doubt as to that connection, that doubt is immediately resolved upon reading the very next limitation of the claim, which is the determining, which explicitly states that the EMG response is one evoked by the electrical stimulation. This is consistent with exactly how the board analyzed the claim and that construction is correct. Your friend on the other side argues that sensing a response of a nerve depolarized is different than sensing an EMG response of a muscle that happens to be coupled to the nerve depolarized, and that that is what broadened this claim. That you have to look at the fact that in Claim 4, there's a limitation that is expressly stated that is actually then arguably omitted from Claim 10. I understand that's the argument. The analysis there is faulty in the sense that it relies on an incorrect construction of original Claim 4, and this was noted in the board's decision on rehearing when they went back and construed Claim 4 and noted that Claim 4 does not require directly sensing the response of a nerve. And that interpretation was entirely consistent with the specification, which by no means would reasonably support such a limited construction of sensing a response of a nerve depolarized by said stimulation. A reasonable interpretation of that is that it would cover indirect sensing, including the very embodiments that are described in the specification, and those are sensing EMG response of a muscle. So if I understand what they're saying, they're saying that Claim 10 was amended during the course of the reexamination to change caused by to coupled to. Is that correct? That's incorrect. There is no caused by. What they're arguing is that there's no causal connection at all. No, but I thought they were talking about an amendment. Was there an amendment to Claim 10? There was an amendment during the course of reexamination. And what was the amendment? Claim 10 was a new claim added in the reexamination. But it wasn't in the course of the reexamination amended? I don't believe it was, no. There was an amendment submitted. Maybe this is a matter of terminology. There was an amendment submitted during the reexamination. That amendment did amend previously existing claims, but also added new claims. Actually, I'm sorry, I think Claim 10 was amended. I'll have to look at this. The earlier version said something like response to a nerve, and what the change was was response to a muscle coupled to a nerve. Is that the gist of this? So the original claim limitation was Claim 4, right? This is an amended version of Claim 4. The original language was sensing a response of a nerve depolarized by said stimulation. Okay. So Claim 10 is a new claim, and the only question is whether Claim 10 allows a broader, something broader than the original Claim 4. It wasn't that Claim 10 was amending Claim 4, it was adding Claim 10. It was adding Claim 10 as a, yes, and the basis of comparison was Claim 4. And so what the board ultimately said is Claim 4 was broad enough to cover everything that's in Claim 10 now. They did say that. It's broad, it's reasonable construction. Among other things, yes. It was broad enough, and then more pertinently, if they analyzed and concluded that there was no subject matter that fell within the scope of Claim 10, that would not have fallen within the scope of original Claim 4. Can you switch to the other issue, the KOROS question, and explain why, terminology aside, KOROS doesn't teach or suggest or motivate somebody to attach some kind of fixation device to what, in your patent, you call the retractor. We agree that the terminology issue is not the dispositive issue here. The dispositive issue, for one, is whether this argument was ever raised in the first place in a timely manner. And with years of reexamination and some 50-something grounds of rejection advanced, the one that's being argued in front of this Court was not one of those grounds advanced. So this is a new argument presented in the context of a rehearing before the Board, and one of the things the Board noted was they could not possibly have overlooked an argument that wasn't made, that, of course, being the standard for granting a request for rehearing. So the issue on appeals was the Board erred in making that decision, and they did not. It was a new issue, and it was appropriate under the Board's rules to deny an issue that was newly raised because it was not in the context of a rehearing, something previously presented and therefore overlooked. Now, if this Court is willing to entertain the merits of that new combination... And just to clarify, the Board addressed this only on the ground of new issue, not on the merits of the KOROS argument. Is that right or not? Well, reading their decision on a rehearing, it does look like they considered the merits and made some commentary directed towards those. But they did state to the extent, you know, this is new argument, that is inappropriate. Okay, so... So it was an alternative analysis of the merits. I believe that's right, yeah. Okay, so now on the merits, why... you know the question about KOROS. Yeah, so on the merits, I mean, let's be clear what is on the table here in terms of subject matter and what's being proposed. So the subject matter of the patent is trans psoas minimally invasive surgery, right, through a lateral approach. The KOROS reference is a reference that's talking about open abdominal surgery where a device is inserted in, and the retractor blades are spreading apart organs and innards to access the spine. And then the distractor blades, these distractor blades 32, are going in with the screws and distracting the vertebral body. Now, even the concept of making modifications or importing limitations is problematic from the sense that these components of KOROS are not sized for a trans psoas approach. They're not safe for a trans psoas approach. And the very modification that's being proposed here, looking at the KOROS reference itself would fundamentally alter that reference. You're talking about adding the screws to 30? Right, whether the screws are removed from 32 and placed on 30, either one of those steps is a fundamental alteration if not destroying the KOROS reference. Remember, the screws on blade 32 are there to help distract a part of the vertebral body. So what did the board say about why it wouldn't be obvious to add the screws to 30? Well, they said it was never presented in that way. And that's true. There is no presentation of... There is no separate mention of screws 32, and the board found that there is no argument in the record of removing components from one set of blades and putting them on the other. Now, with respect to the concept of adding... Where do they... What page do they say that on? I think it's 25 of the appendix, or it's in the request for rehearing. 25 is where there are two KOROS references. Page 6 of the rehearing order? Do you have the rehearing opinion in front of you? It's not right in front of me at the moment, Your Honor. In the back of the blueprint. Maybe you can at least cite the pagination from the original rehearing number since you don't have J.A. numbers on your... Or they don't have J.A. numbers on their addendum. Okay, so there are two grounds. There's ground A or ground 17, and then ground B, which is 18. So in 17... Page number, please. This is page 4 of the rehearing and 21 of the appendix. Thank you. So the problem the board noted is that there's no cite... What the requester did was cite to the plate 30, noting that those plates 30 included one of the features, which would be the proximal feature, the releasably lockable to a frame, and then referenced the screws as also being included. The board noted that those were not components of the same blade. Well, they seem to reject that as a new argument now. Well, they rejected the simple citation as what seemed to be a misapprehension of the reference. Now, in rehearing, it was presented by the requester as a suggestion to essentially make a new modification of KOROS to import the screw limitation into the blade limitation. That was rejected as a new argument. And I think that is on page... It's 23 of the appendix. Page 6. Page 6. Furthermore, in connection, Medtronic did not present a credible basis for concluding that it would have been obvious to implement KOROS's locking mechanism 32 and tubular guide 32 into the retractable plate 30 to the extent it now makes this connection as untimely. And that's accurate. Now, there were, as to the... Are 82 and 83 the screws? 83 are the screws, Your Honor, and 82, I believe, is the internal locking... I'm sorry, internal tubular guide. So the screws go through the interior of the blade through a tubular guide. But 83 is the screw. Now, with regard to the combination itself, even considering this new combination, the argument was presented by the patent owner. It wasn't necessary for the board to ever get to this issue, per se, because it was a new argument. But this idea of taking retraction screws off of one set of blades is meant to distract both of the vertebral bodies away from each other, and removing them no longer provides the functionality of that vertebral body distraction. Putting those screws into different blades that are designed to hold vital organs apart in an open abdominal procedure makes no... I mean, it's futile, and there's no reason to do it. There's argument that it would be unsafe to do so. And that certainly makes sense, because one of the key tissues being held away from the spine in an abdominal procedure are some of the vital arterial blood vessels, which obviously are nicked, could be fatal. So adding screws to those components simply doesn't make sense. And I think there was a comment of whether there was any expert testimony on this, and the answer is no. If there was expert testimony, certainly this would be an issue that would have to be explained, and I don't think it can be. Okay. Thank you, Mr. Rosano. Thank you. Mr. Oliver. Thank you, Your Honor. First of all, I'd like to address whether Coros was a new issue. The claim chart and original presentation of this proposed rejection referenced Blade 30, but also stated separately that screws may be used with retractor blades. Not Retractor Blade 30, not Retractor Blade 32. What seems to have happened below is it got off on a tangent of whether Retractor Blade and Distractor Blades or Retractor Blade 30 and Distractor Blade 32 were different. And what we argued below was correctly that they're not different. If you look at Coros as a whole, which is what was required, in the background it describes that all of these are Retractor Blade. Why are we getting all of this as lawyer argument instead of putting in declarations from experts about how it would be feasible to modify Coros to add the screws to 30? Well, there are expert declarations. They didn't address the specific issue. But that's the point. I understand that, Your Honor. You don't bring the expert testimony before the board, and then you come up here and all you've got is lawyer argument asking us to make a decision about a technical subject that we're not expert about. Our argument on the appeal has been that there's no need to modify Coros because Coros describes that Retractor Blades may have screws. And if it broadly discloses that Retractor Blades may have screws, you don't need expert testimony to say that that is what is part of the Coros disclosure. Now, there's been an attorney argument as to whether or not this would be dangerous, but I don't understand how that argument works since Coros already described that you put these screws on blades. And they're saying if for some reason if they were on a different set of blades, it would suddenly become dangerous because this is an abdominal surgery. It's a spine surgery. But the claims of the patent clearly differentiate between the Retractor Blades and the Distractor Blades. And you're asking us to say that they can be completely interchangeable without giving us any expert testimony as to why that's so. Well, we don't think that you need expert testimony if the background describes as a whole that these are all Retractor Blades and that the blades may include screws. As we cited on our brief, that was even claimed by a child of the Coros patent, that you can use screws on Retractor Blades. This argument that it's only somehow limited to Distractor Blades sort of looks at the preferred embodiment. We don't disagree that the preferred embodiment gives names and numbers to particular blades. It could have been first blades and second blades. They're called Distractor Blades because the ones that happen to have the screws are what help pull apart bone because they screw in the bone. Okay. I think we're out of time, Mr. Oliver. Thank you. Thank both counsel in the cases today. Thank you.